UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Charles T. Hopkins,

      Plaintiff,

v.                                                          Case No. 17-12261

State of Michigan, *et al.*,                               Sean F. Cox
                                                            United States District Court Judge
      Defendants.

_____/

## OPINION & ORDER

      Plaintiff Charles T. Hopkins, a corrections officer employed by the Michigan Department

of Corrections ("MDOC"), filed this suit against multiple Defendants, asserting multiple claims,

based on multiple incidents. The matter is before the Court on Defendants' Motion for Summary

Judgment. At this juncture, following Defendants' filing of their motion, only three Counts

remain at issue: 1) a race discrimination claim under Title VII, that is based on one disciplinary

incident for insubordination; 2) a Title VII retaliation claim, based upon two other disciplinary

incidents that occurred after Plaintiff filed an EEOC complaint; and 3) a § 1983 equal protection

claim that is now asserted against Defendant Warden Klee alone. The parties have fully briefed

the issues and the Court heard oral argument on November 15, 2018.

      Because Defendants claimed that Plaintiff submitted an untimely expert statistical report

for the first time in responding to the motion, this Court issued an order requiring Plaintiff to

show cause  why the Court should not strike that report and decline to consider it for purposes of

the pending motion. Thereafter, Plaintiff's Counsel conceded that the expert report was not

produced to Defendants by the agreed deadline. This Court will therefore not consider that

expert report for purposes of this motion.

As explained below, the Court shall: 1) grant summary judgment as to the Title VII race discrimination claim because Plaintiff cannot establish a prima facie case, based on the insubordination incident; 2) deny summary judgment as to the Title VII retaliation claim, because Plaintiff has submitted sufficient evidence to establish a prima face case, and pretext, as to the two disciplinary incidents at issue for this claim; and 3) grant summary judgment in favor of Warden Klee as to the § 1983 equal protection claim, which is analyzed in the same manner as the race discrimination claim based on that same incident.

## BACKGROUND

Plaintiff Charles T. Hopkins, an employee with the MDOC, filed this action on July 11, 2017, based upon federal-question jurisdiction. His Second Amended Complaint is the operative complaint.

In it, Hopkins names the following ten Defendants: 1) the MDOC; 2) the State of Michigan; 3) Warden Paul Klee, in his individual capacity; 4) Lieutenant John Fleenor, in his individual capacity; 5) Inspector Kenneth Salisbury, in his individual capacity; 6) Corrections Officer Melissa Christiaens, in her individual capacity; 7) Arus Connie Woodard, in her individual capacity; 8) Resident Unit Manager Brian Evers, in his individual capacity; 9) Deputy Warden Donald Ricumstrict, in his individual capacity; and 10) Acting Sergeant Michael Duperron, in his individual capacity.

Hopkins's Second Amended Complaint included the following five counts in this action: 1) "Disparate Treatment Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e-" (Count I), asserted against the MDOC and the State, wherein Hopkins alleges that he was discriminated

against on the basis of his race; 2) "Retaliation Title VII of the Civil Rights Act of 1964 – 42 U.S.C. § 2000e-2" (Count II), asserted against the MDOC and the State, wherein Hopkins alleges that he was retaliated against after having complained of discrimination; 3) "Equal Protection Violation of Constitutional Rights Under The Fourth and Fourteenth Amendments of the United States Constitution Pursuant to 42 U.S.C. § 1983" (Count III), asserted against the individual Defendants, in their individual capacities; 4) "Free Speech Violation of Constitutional Rights Under the First and Fourteenth Amendments of the United States Constitution Pursuant to 42 U.S.C. § 1983" (Count IV), asserted against the individual Defendants, in their individual capacities; and 5) "Entity Liability Inadequate Policies/Procedures/Customs, Failure to Train, Ratification/Acquiescence" as to Defendants MDOC and Defendant Klee (Count V).

On May 30, 2018, the parties noted that "Defendants have recently become aware that Plaintiff has retained a statistical expert to support his disparate impact and treatment claims in the employment law context" and the parties stipulated that "Plaintiff's Expert Reports are *due May 31, 2018.*" (ECF No. 23) (emphasis added). Hopkins never filed a motion seeking an extension of that date.

On July 16, 2018, following the close of discovery, Defendants filed a Motion for Summary Judgment. This Court's practice guidelines, which are expressly included in the Scheduling Order issued in this case, provide, consistent with Fed. R. Civ. P. 56, provide in pertinent part that:

    a.    The moving party's papers shall include a separate document entitled
          Statement of Material Facts Not in Dispute. The statement shall list in
          separately numbered paragraphs concise statements of each undisputed
          material fact, supported by appropriate citations to the record. The

Statement shall include all necessary material facts that, if undisputed, would result in summary judgment for the movant.

b.     In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

c.     All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

d.     The statements shall be non-argumentative and avoid the use of color words or distortions of the record in a party's favor. Conclusory, speculative, or conjectural statements in support of a position shall be avoided. Hearsay statements and other inadmissible evidence cannot be considered.

e.     Facts stated in the Statement of Material Facts Not In Dispute and Counter-Statement of Disputed Facts shall be supported with appropriate citations to the record, including but not limited to the pleadings, interrogatories, admissions, depositions, affidavits and documentary exhibits. Citations to the record must be specific, *ie*., cite to a discrete page or portion of deposition testimony or page(s) of documentary evidence, not simply the entire deposition or document . . . .

(ECF No. 11 at Pg ID 155-56).

Within their Motion for Summary Judgment Defendants filed a "Statement Of Material Facts Not In Dispute" (ECF No. 25 at Pg ID 279-295) ("Defs.' Stmt. A"). Within his Response to the motion Hopkins filed a "Counter-Statement of Disputed Facts" (ECF No. 28 at Pg ID 833-847) ("Pl.'s Stmt."). Along with their response brief, Defendants responded to the additional facts set forth in Plaintiff's Statement ("Defs.' Stmt. B").

Counsel for both parties did an especially good job of complying with this Court's practice guidelines. As a result, many facts are undisputed.

The following material facts are either undisputed, or are gleaned from the evidence submitted by the parties, *viewed in the light most favorable to Hopkins, the non-moving party*. Because Hopkins has abandoned some of his claims in responding to the pending motion, the Court includes here only those facts that are relevant to the claims Hopkins wishes to pursue.

Hopkins is an African-American man that began his employment with the MDOC in October of 2013. (Def.'s Stmt. A & Pl.'s Stmt. at ¶ 1). During the times relevant to this case, Hopkins was employed as a corrections officer at the Gus Harrison Correctional Facility. (*Id*. at ¶ 2).

**Insubordination Incident Involving Sergeant Duperron**

On April 9, 2016, Hopkins was assigned to food service. (*Id*. at ¶ 23). On that day, "there was an incident with the food being undercooked, and it really, really – it incensed the inmates." (*Id*. at ¶ 24) (quoting Hopkins Dep. at 41).

Hopkins claims that he "deescalated" the food situation and alleges that "the food service people," "[t]hey decided that we would kind of maybe mitigate the food issue by serving like an extra portion to these particular guys that were waiting because this might have been probably an hour because they had to prepare another meal and all kind of stuff, and so we figured it out." (Def.'s Stmt. A & Pl.'s Stmt. at ¶ 25). Hopkins further testified:

> The chow hall is what they call the food service. After it was cleared out, I decided to speak to Sergeant Duperron. And looking back, it was kind of an impulsive thing. I shouldn't have said anything to him, but I did.
> And as he was walking by with another supervisor I asked if I could speak with him a moment, and he stepped into the food service, and I asked him about the incident earlier and why didn't he respond because he was actually in food

> service as it was going on, and that's what supervisors usually do anyway, that's actually their job, they come over and they kind of take control of it.
>
> It was fine because I took control of the situation. When I asked him that – before he said a word, I noticed that I might have – I probably shouldn't have asked him that because he visually started becoming – I could see him getting upset.

(Hopkins Dep. at 43). This confrontation occurred when there were inmates in the back, in the dock area way in the back. (Def.'s Stmt. A & Pl.'s Stmt. at ¶ 28). Hopkins testified that "Duperron, he started raising his voice. Both of our voices started raising at that time because he started raising his voice at me." (*Id*. at ¶ 29).

Hopkins testified: "I can't remember exactly, but I think [Duperron] was saying maybe – he was telling me that well, this what I did, I was doing this and I was doing that. I was like no, what I'm explaining to you is when I was over there, I had ten inmates in my face. Because they were in my face. I mean, it was, you know, a tense moment." (Def.'s Stmt. A & Pl.'s Stmt. at ¶ 30). After these comments is "when [Duperron] really got upset and he said hey, you know what, who told you to authorize hot dogs." (*Id*. at ¶ 31).

Hopkins then testified: "at that moment when you have two people and their voices are, you know, on ten, both trying to make their points shouting, sometimes rationale and reasoning goes out the window because it was like we were going back and forth, and then he abruptly told me to get to the command center, and he gestured to the command center . . ." (*Id*. at ¶ 32).

Hopkins responded saying "who are you talking to, you're not talking to a dog, you're not talking to a – I might have said a kid or a dog, and then he said it again. And I said well, wait a minute, and so he grabs the phone instantly and called over to the commend center." (*Id*. at ¶ 33). Duperron told the person on the phone that he gave Hopkins a "direct order" to go to the command center. (*Id*. at ¶ 34). Hopkins replied "I'm not an Inmate!" (*Id*. at ¶ 35).

Hopkins later explained that "When someone angrily bellows 'commands' that begin with 'get to' anywhere, what initially comes to my mind is a five [year] old, an animal or someone in a slave narrative."  (*Id*. at ¶ 36).

Over the phone, Lieutenant Siler asked Hopkins to "step down to the command center," Hopkins claims that he went to the command center, and "told Siler what happened and everything and then that was pretty much it."  (*Id*. at ¶ 37).

Hopkins later "pulled [Duperron] aside, and . . . told him that hey I shouldn't have said anything to you, the day was over, you know, we resolved the issue and just move on."  (*Id*. at ¶ 39).

A few days following the incident, when Hopkins pulled aside Duperron to speak to him about the incident, Duperron responded that he "felt like [Hopkins was] calling [him] . . . a punk indirectly," which was "why he had gotten upset."  (Pl.'s Stmt. at 82; Defs.' Stmt. B at 82).

When asked "did Mr. Duperron give you a direct order?" Hopkins responded, "I guess he actually did," but Hopkins's "issue with that is that [corrections officers] give inmates direct orders all day" and Hopkins has not "heard a supervisor actually use that verbiage when instructing an officer to do something."  (*Id*. at ¶ 40).

Lieutenant Siler initiated a request for an investigation into this incident on April 14, 2016.  (*Id*. at ¶ 38; Defs.' Ex. 6 at Pg ID 503).  Warden Klee approved the recommendation for an investigation into the incident on April 15, 2016.  (*Id*.).

Hopkins received notice that the MDOC would be conducting an investigation into the April 9th incident on June 24, 2016.  (Pl.'s Stmt. at ¶ 79; Defs.' Stmt. B at ¶ 79).

During the conference regarding the matter with Warden Klee, Hopkins explained that

the events with the inmates giving rise to his interaction with Duperron "was a potentially dangerous incident," a "tense moment." (Pl.'s Stmt. at ¶ 80; Defs.' Stmt. B at ¶ 80). Hopkins expressed that when he questioned Duperron why he did not come to his aid earlier, "Duperron took it the wrong way, as if Hopkins was questioning his mettle, which "led to a heated exchange." (Def.'s Ex. 6). Hopkins further expressed that when Duperron shouted at him, "at that moment . . . [he felt] instantly degraded, humiliated and powerless." (*Id.*).

A disciplinary conference was held on July 15, 2016 by Warden Klee and he ultimately found that Hopkins violated Work Rule 10 – Class 1 Insubordination. (Defs.' Ex. 6 at Pg ID 492-93). Warden Klee "noted that a three-day suspension is the normal sanction for this violation but stated that the department's discipline coordinator will make final determination in this case." (*Id.*).

Hopkins was apparently then given a three-day suspension by the Discipline Coordinator Jennifer Nansay. (Defs.' Ex. 6 at Pg ID 490). But that discipline was later reduced to a two-day suspension by settlement agreement between Hopkins's Union and MDOC. (*Id.* at ¶ 42).

**September 1, 2016 Complaint And Investigation Regarding Duperron Incident**

On September 1, 2016, Hopkins filed a complaint with the MDOC complaining about the investigation that Brian Evers conducted regarding the subordination incident. But because Hopkins is not basing any claims on that internal complaint, the Court need not address those facts. (*See* Pl.'s Stmt. at 9 n.2).

At that same time, Hopkins also filed an internal complaint against Duperron in which he claimed that Duperron "made verbal references and physical jesters [sic] that were extremely offensive." These involved "[s]houting to 'get to'" the command center because this is "a verbal

command you would only give to an animal or a slave in a slave narrative" and the fact that Duperron "pointed his fingers as he shouted." (Def.'s Stmt. A & Pl.'s Stmt. at ¶ 47). The aggressive gesture was pointing to the command center. (*Id.* at ¶ 48). Hopkins further testified that Duperron never made any racial comments to him. (*Id.* at ¶ 49).

Warden Klee assigned Deputy Warden Ricumstrict, who is African-American, to investigate Hopkins's complaint. (Defs.' Stmt. B and Pl.'s Stmt. at ¶ 89). Ricumstrict was a deputy Warden with more than 28 years experience. (Ricumstrict Dep. at 6). Ricumstrict testified that while he has "done a lot of investigations" during those 28 years, his investigation of Hopkins's complaint was first one he had probably done in the last ten or fifteen years. (*Id.* at 25).

Hopkins testified that when he brought his complaint of discrimination about Duperron, Deputy Warden Ricumstrict "wasn't very welcoming" regarding it. (Hopkins Dep. at 90).

Deputy Warden Ricumstrict ultimately determined that there was "insufficient evidence" to support Hopkins's allegation that Duperron acted inappropriately in ordering him to report to the command center. (Defs.' Ex. 9 at Pg ID 6710). His comments stated:

> There is insufficient evidence to support the allegations by C/O Charles Hopkins that Sgt. Michael Duperron acted in appropriately when "he ordered" Hopkins to report to the command center. Hopkins responded that he was not a prisoner nor an animal. Hopkins ultimately refused to report to the command center. The investigation determined that voices were raised between Sqt. Duperron and C/O Hopkins, but Duperron was attempting to take the disagreement they were having out of the area where prisoners were standing and possibly observing. Lastly, there was no evidence that Sgt. Duperron used language of a racial nature such as nigger, boy, etc.

(*Id.*). As to his investigation, Ricumstrict testified as follows:

> Q.     So in your opinion if Sergeant Duperron did state to Officer Hopkins I'm giving you a direct order to go to the com center, that would not be

9

|   | improper? |
|---|---|
| A. | No. |
| Q. | Was there – did you make a determination or attempt to make a determination as to whether this incident was captured on audio or video? |
| A. | Oh. I did not. |
| Q. | And based upon your familiarity with this facility and where this incident occurred in the chow hall, is that someplace where there may have been audio or video? |
| A. | There may have been video, no audio. |
| Q. | And is there at this facility any audio to go along with that video that you're aware of? |
| A. | No. No. |
| Q. | Do you recall why it is that you did not look to see if the chow hall and this incident was captured on video when you were conducting this investigation? |
| A. | I didn't really think about it because I don't – I didn't really think it was relevant as to needing video for something.  Nobody's denying that there was a conversation, nobody's denying that these guys weren't together, so the thought of getting an audio – I mean, a video of it I didn't really put a lot of though into that getting a video of the situation. |
| Q. | You mentioned earlier that you thought Office Hopkins' complaint was subjective in nature. Do you recall stating that? |
| A. | Yes. |
| Q. | Do you agree that video showing the demeanor of Sergeant Duperron or Officer Hopkins during this incident could potentially corroborate Officer Hopkins' subjective impression of Sergeant Duperron's conduct? |
| A. | In my opinion, based on the statements that were made, I don't think it's relevant. |
| . . . . | |
| Q. | But as far as the pointing specifically, that would be reflected or depicted in video, would it not? |
| A. | Yes. |
| Q. | And do you agree that if Sergeant Duperron was pointing in the manner that Officer Hopkins described in this complaint that would be relevant towards corroborating the veracity of Officer Hopkins's version of these events? |
| A. | I could be. |

(Ricumstrict Dep. at 30-33).

Ricumstrict found that both Hopkins and Duperron had their voices raised during the

incident.  (Defs.' Stmt. B & Pl.'s Stmt. at ¶ 94).  While shouting at a subordinate could

"potentially be a work rule violation" of conduct unbecoming, Ricumstrict never considered "a conduct unbecoming work rule violation investigation into [Sgt.] Duperron's conduct in addition to th[e] discriminatory harassment investigation." (*Id*. at ¶ 95).

After finding no cause on October 20, 2016, Ricumstrict forwarded his opinion to Warden Klee for approval. Warden Klee concurred with Ricumstrict's findings. (*Id*. at ¶¶ 96-97).

The investigation was closed on November 28, 2016. (Def.'s Stmt. A & Pl.'s Stmt. at ¶ 51).

**Hopkins's November 29, 2016 E-Mail Complaint To Washington**

On November 29, 2016, Hopkins sent an e-mail to Heidi Washington, the director of the MDOC, asserting a complaint about the working conditions at Gus Harrison, asserting that "this has been without a doubt the most egregiously racist place I have ever worked at" and asserting that he has been subjected to "unfair treatment due to racial bias and discrimination." (Defs.' Ex. 10 at Pg ID 718-19). Hopkins's complaint arose out of his belief that there is a "glaring double standard" as to how black and white officers are disciplined. He alleged that "Black officers are clearly disciplined more severely than their white counterparts for similar" offenses. His complaint further alleged that he had an off-the-record conversation with a white corrections officer ("CO") where he was told that "these people don't want you here." (*Id*.).

After this claim was investigated, it was determined that there was insufficient evidence to support Hopkins's claim. (Def.'s Stmt. A & Pl.'s Stmt. at ¶ 53).

**Hopkins's EEOC Complaint**

On January 11, 2017, Hopkins filed a charge of discrimination with the EEOC. (Def.'s

Stmt. A & Pl.'s Stmt. at ¶ 54).   That charge asserted race and sex discrimination.

In the body of that charge, Hopkins asserted that "[s]ince 2014 and as recently as April 9, 2016, I have been subjected to different terms and conditions of employment, discipline and suspension, due to my race, Black, and gender, male.  I am aware of Caucasian, females that have committed the same and worse offences [sic] that have been treated better in exchange for sexual favors.  I am also aware of Caucasian Officers that have engaged in physical altercations that have not been disciplined in any way.  I am aware of others (African American, males) that have been treated in a similar manner as me.  I can only conclude that my gender and race are factors in disciplinary action."  (*Id*.).

On April 12, 2017, Hopkins was issued a "right to sue" letter from the EEOC.  (Def.'s Stmt. A & Pl.'s Stmt. at ¶ 56).

### **"Tools And Equipment Incident"**

On April 9, 2017, Hopkins left his radio and round reader on a desk in the healthcare unit in the prison.  (*Id*. at ¶ 70).  The next day, a nurse reported that a desk had been left unlocked.  (*Id*. at ¶ 71).  Video was reviewed and it was determined that Hopkins left his radio and round reader unsecure on several occasions that night, and left a desk and the ER doors unsecured.  (*Id*. at ¶ 72).

Hopkins was charged with violating Work Rules 13, 27, and 31.  (Defs.' Stmt. B & Pl.'s Stmt. at  ¶ 98).  The Warden's decision to investigate Hopkins for a disciplinary infraction occurred at the latest on April 14, 2017, and Hopkins received notice of the investigation on April 25, 2017.  (*Id*. at ¶ 99).

Warden Campbell held a disciplinary conference regarding this matter on August 1,

2017.  (*Id*. at ¶ 100).

As one of the allegations included the security of the doors, during the disciplinary conference another CO and Hopkins's union representative, Paul Reasoner, stated it was "common practice for the doors to be unsecured" and requested the "charges related to the locking of the doors be dismissed."  (*Id*. at ¶ 101).  Reasoner also requested leniency at the conference regarding the "equipment" allegations because the items "were left in a secure area . . . this was a case of human error" and Hopkins is "a good officer who made a mistake."  (*Id*. at ¶ 102).  During the investigation, some of the nurses involved also said it was "regular occurrence" and/or "common practice" that the doors in question "always remained open" and that a "radio unit . . . is always left out for the on-coming nurse."  (*Id*. at ¶ 103).  Hopkins also explained in his investigatory response that it "is quite common for officers to remove their duty belts and/or equipment before being relieved."  (*Id*. at ¶ 104).

Warden Campbell "found sufficient evidence to substantiate a violation of the three work rules."  (Defs.' Ex. 13 at Pg ID 790-91).  Hopkins ultimately received either a three or four-day suspension, which took place on August 22, 2017.  (*Id*. at ¶ 74).  Warden Klee was not involved in this incident, as it took place after his retirement.

During his deposition in this case, Hopkins testified as follows after discussing this incident and investigation:

> See, now I'm observant, I sit and watch, I watch these guys walk away and leave stuff open, and I laugh to myself, these guys gave me all this time off and took all this money, suspended me these days, taking money from me and my family, and I sit and watch these things. I would watch supervisors come in and they don't say one word.

(Hopkins Dep. at 66-67).

**"Restricted Room Incident"**

On April 27, 2017, it was alleged that Hopkins "failed to ensure that caustic/tool closet door was properly closed, allowing a prisoner to gain access to the room and take control of a dangerous tool which he attempted to use to gain access to the contraband locker." (Defs.' Ex. 12 at Pg ID 746).

The Warden's decision to investigate Hopkins for a disciplinary infraction occurred at the latest on April 28, 2017 and Hopkins received notice of the investigation on July 13, 2017. (Defs.' Stmt. B. & Pl.'s Stmt. at ¶ 107)

Hopkins testified that the closet in question is "a room" that COs frequent throughout the day, and where the COs have a "refrigerator, microwave, and all kinds of things." (Hopkins Dep. at 58-59).

The door to it closes by itself, but when Hopkins "walked out" a prison inmate "dropped a mop and propped the door" open as Hopkins walked out of the office and walked back toward the officer station. (Def.'s Stmt. A & Pl.'s Stmt. at ¶ 58). The inmate snuck in after Hopkins exited and tried to break into the contraband locket that was inside the caustic closet. (Def.'s Stmt. A & Pl.'s Stmt. at ¶ 60). That prisoner was inside the closet for approximately 3 minutes before he was discovered. (*Id.* at ¶ 61). While inside the closet, that prisoner had access to a metal ice scrapper and other items. (*Id.* at ¶ 62). Once the prisoner was discovered, he handed the ice scraper to the corrections officer who discovered him. (*Id.* at ¶ 63). Hopkins claims "[s]o it wasn't, you know – I guess the impression or the narrative I should say, this guy was back there with this tool about to kill someone. No, he was trying to go into the locker, he handed the locker." (*Id.* at ¶ 65). Then Hopkins "went back there, [and] cuffed [the prisoner] right up." (*Id.*

at ¶ 65).

A disciplinary conference was held by Warden Sherman Campbell[1] on July 13, 2017. (Defs.' Ex. 12 at Pg ID 747). The alleged violations were described in the memorandum that contains the findings as follows:

> Alleged Violation: It is alleged that Charles Hopkins failed to ensure that a caustic/tool closet door was properly closed, allowing a prisoner to gain access to the room and take control of a dangerous tool which he attempted to use to gain access to the contraband locker. *This conduct was a possible violation* of MDOC Work Rule #13 – Enforcing Rules, Regulations, Policies, Procedures, Post Orders and Work Statements; #27 – Dereliction of Duty, #31 – Security Precautions, and #32 – Attention to Duty. See disciplinary packed for specified information.

(*Id.*) (emphasis added). That is, Hopkins was charged with violating Work Rules 13, 27, 31 and 32. (Defs.' Stmt. B & Pl.'s Stmt. at ¶ 106).

The memorandum contains information as to the employee's statement, which includes "Charles Hopkins stated that he walks through the same door that everyone walks through every single day. Policy is clear but his actions were not a mistake or flagrant action" and that Hopkins believes he is "being singled out because he is black." (Defs.' Ex. 12 at Pg ID 747).

The memorandum also contains information from Hopkins's representative, who "mentioned that a work order had been submitted for the door" because the "doors normally close automatically." (*Id.* at Pg ID 748).

The memorandum states that "Warden Campbell found sufficient evidence to substantiate a violation of all four work rules. He will confer with the department's discipline coordinator

---

[1]Warden Campbell replaced Warden Klee in approximately February of 2016, after Klee's retirement. (Ricumstrict Dep. at 14). Thus, Klee had no role as to the investigation of this incident.

15

prior to determining a sanction."  (*Id*. at Pg ID 748).

The disciplinary packet contains an Employee Discipline Report for this incident, that appears to have been signed by the Warden on August 4, 2017.  (*Id*. at Pg ID 746).

A copy of that same Employee Discipline Report, but which appears to have been signed by the discipline coordinator on August 21, 2017, states "7 Day Suspension," followed by the words "aggravating circumstances" at the bottom of the page.  Although the report contains a separate section to "Explain Aggravating or Mitigating Circumstances," that section was left blank.  (*Id*. at Pg ID 744).

Ricumstrict testified that decisions regarding aggravating circumstances are normally made at the Warden's level.  (Ricumstrict Dep. at 38).

That seven-day suspension was later reduced to a five-day suspension after Hopkins grieved the discipline.  (Def.'s Stmt. A & Pl.'s Stmt. at ¶ 67).  The suspension took place on August 22, 2017.  (*Id*. at ¶ 68).  That suspension cost Hopkins approximately $1,500.00 in lost wages.  (*Id*. at ¶ 111).

**Discovery In This Action**

Hopkins filed this action on July 11, 2017.  During discovery, Hopkins testified that an employee named Alcadraj "told him" about an incident that Alcadraj had with another employee:

> Q.   Is that an incident that happened between Alcadraj and Leslie?
> A.   That's a different incident.  That's an incident Alcadraj actually told me. He said he and Sergeant Leslie had an all-out argument in front of everybody, and the supervisors advised them to go basically in the back room and work it out and they did.
> Q.   Do you know who the supervisor was?
> A.   I believe it was Messer, Captain Messer.

(Hopkins Dep. at 134-35).

Ricumstrict testified that having discipline on your record can impact a correction officer's ability to transfer:

> Q.     And does having discipline on your record affect your ability to transfer?
> A.     Yes, it does.
> Q.     And can you explain how that is?
> A.     I believe you have to be – disciplinary action normally carries with it two years, and once those two years are up then you're free to transfer.  But I'm not an expert on their contract.  Their contract has stipulations and rules and those things. . .

(Ricumstrict's Dep. at 56).  Ricumstrict further testified that Hopkins expressed to him his frustration about being unable to transfer because he had discipline on his record.  (*Id*. at 55).

Hopkins states that he obtained discovery in this action regarding the racial make up of correction officers at Gus Harrison from 2014 to 2017, along with every incident of discipline, including the number of work rules found to have been violated and the disciplined CO's race.  (Defs.' Stmt. B & Pl.'s Stmt. at  ¶ 115).

In his Statement, filed on August 20, 2018, Hopkins states that his "expert statistician then analyzed these numbers," and found between 2014 and 2017 the "discipline rate for African-American corrections officers is between 20% and 33.33%, while the discipline rate for the 'Other' corrections officers is between 3.9% and 6.03 %."  (Pl.'s Stmt. at ¶ 116).  Hopkins's Statement makes further assertions regarding the findings of his expert in paragraphs 117 & 188.

In response to those paragraphs, Defendants state as follows in the Statement contained within their Reply Brief:

> Disputed. Plaintiff failed to produce any expert report by this Court's May 31, 2018 deadline in this Court's May 30, 2018 order; therefore, Defendants move that this report be struck and that it not be considered for purposes of this motion.

(Defs.' Stmt. B at ¶¶ 116-118).

As such, this Court issued a Show Cause Order requiring Plaintiff to respond by October 29, 2018, why the Court should not strike that report and decline to consider it for purposes of the pending motion. (ECF No. 33). Thereafter, Plaintiff's Counsel acknowledged that Plaintiff's expert statistical report was not produced by the May 31, 2018 deadline and that the Court therefore has the discretion to strike it. (ECF No. 34). Having considered the matter, pursuant to Rule 37(c)(1), this Court will not consider the statistical expert report for purposes of this motion. In addition, Plaintiff may not use that report at trial or offer testimony from that statistical expert at trial.

## ANALYSIS

In their Motion for Summary Judgment, Defendants challenge each of the five counts. After Defendants filed their motion, Hopkins stipulated to the dismissal of Count V, the municipal liability count, with prejudice (*see* ECF No. 29) and concedes that Defendants are entitled to summary judgment as to the First Amendment Retaliation claim in Count IV. (*See* Pl.'s Br. at 25). As such, the Court will analyze the challenges to the remaining three counts: 1) race discrimination in violation of Title VII asserted in Count I, 2) unlawful retaliation in violation of Title VII asserted in Count II, and 3) the equal protection violation claim asserted under § 1983 in Count III.

## I.     Challenges To Count I, Hopkins's Title VII Race-Discrimination Claim

Defendants' motion begins with sections generally discussing the statute of limitations as to Title VII claims and the *McDonnell-Douglas* burden-shifting paradigm. The brief then

discusses multiple incidents that came up during the course of the litigation for which Hopkins may be asserting a Title VII discrimination claim: 1) use of profanity against a co-worker; 2) verbal counseling for being out of uniform; 3) insubordination; 4) allowing prison access to a restricted room; and 5) leaving tools, equipment, and area unsecure. (*See* Defs.' Br. at 5-8). Defendants then make various challenges, including statute-of-limitations challenges and burden-shifting challenges, as to each of those different incidents.

In responding to the motion, however, Hopkins has rendered most of those incidents moot for purposes of analyzing this count. That is because, for purposes of Plaintiff's Title VII disparate treatment claim, Hopkins only seeks to use "the April 8, 2016 occurrence and ensuring discipline and suspension." (Pl.'s Br. at 2). That incident is referred to by the parties as the "Duperron incident."

As to Hopkins's disparate treatment claim based on the Duperron incident, Defendants do not appear to challenge it on statute of limitations grounds. Rather, they appear to challenge Hopkins's ability to establish a prima facie case and/or pretext under the familiar *McDonnell Douglas* burden-shifting paradigm. (Defs.' Br. at 6).

A plaintiff alleging discrimination under Title VII may prove his or her claim using either direct or circumstantial evidence. Here, Hopkins does not assert that the has any direct evidence of discrimination. (Pl.'s Br. at 3). Rather, Hopkins asserts that he can survive summary judgment under the circumstantial-evidence approach. (*Id*.).

Where a plaintiff relies on such circumstantial evidence, the familiar *McDonnell Douglas* burden-shifting framework is used. *Arendale v. City of Memphis,* 519 F.3d 587, 603 (6th Cir. 2008). First, the plaintiff must establish a prima facie case of discrimination. Once he does that,

the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the challenged adverse action. If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination. *Id.*

### A. Can Hopkins Establish A Prima Facie Case Of Race Discrimination Based On The Duperron Incident?

"Generally speaking, a plaintiff alleging employment discrimination in employee discipline must make a four-part showing in order to set forth a prima facie case of discrimination:" 1) he is a member of a protected class; 2) he was qualified for the job; 3) he suffered an adverse employment action; and 4) he was treated differently than similarly-situated non-protected employees. *Arendale*, 519 F.3d at 603.

There does not appear to be any dispute that Hopkins can establish the first two elements, as: 1) he is a member of a protected class (African-American); and 2) he was qualified for his job as a corrections officer. There also appears to be no real dispute that being suspended without pay is an actionable adverse action for purposes of Title VII.

Rather, the dispute is whether Hopkins can show that a similarly-situated, non-protected employee was treated more favorably than Hopkins. Defendants assert that Hopkins "cannot point to any corrections officer who disobeyed a direct order and received any kind of different treatment" and, therefore, he "cannot meet the third prong of a prima facie case of discrimination." (Defs.' Br. at 6).

To satisfy the fourth element of a prima facie case of discrimination, Hopkins must point to a similarly-situated person outside the protected class who received more favorable treatment. The plaintiff and the employees with whom the plaintiff seeks to compare herself must be similar

in all of the *relevant* respects. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994). Factors to consider include whether the individuals dealt with the same supervisor, were subject to the same standards, engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Thus, to meet his burden of demonstrating that another employee is similarly-situated, Hopkins must show that there is someone who is directly comparable to him in all material respects.

In his response, Hopkins appears to assert that: 1) Duperron was a similarly-situated non-protected employee who was treated better than he was; and 2) that a white Corrections Officer named Alcadraj was treated more favorably than he was treated. (Pl.'s Br. at 6).

### 1. Duperron

Hopkins first asserts that Duperron was a similarly-situated non-protected employee who was treated more favorably than he was for similar conduct. (Pl.'s Br. at 6). In doing so, Hopkins notes that he and Duperron had a heated exchange, yet the MDOC did not investigate Duperron for a work-rule violation for raising his voice during the exchange. This attempted comparison fails because, like Duperron, Hopkins was not disciplined or investigated for having raised his voice. Rather, with respect to the Duperron incident, Hopkins was only disciplined for having violated Work Rule 10 - Class 1 insubordination, for failing to comply with a direct order by his superior, Sergeant Duperron.

### 2. Alcadaj

Next, Hopkins seeks to compare his treatment with that of a white corrections officer named Alcadraj, who allegedly had an "all-out argument in front of everybody" but who did not

21

receive discipline. There are two problems with this attempted comparison.

First, the only evidence of the alleged dispute between Alcadraj and Sergeant Leslie is Hopkins's hearsay testimony:

> Q.    Is that an incident that happened between Alcadraj and Leslie?
> A.    That's a different incident. That's *an incident Alcadraj actually told me. He said* he and Sergeant Leslie had an all-out argument in front of everybody, and the supervisors advised them to go basically in the back room and work it out and they did.
> Q.    Do you know who the supervisor was?
> A.    I believe it was Messer, Captain Messer

(Hopkins Dep. at 134-35) (emphasis added). Hopkins cannot avoid summary judgment with that hearsay testimony.

Second, even if he had admissible evidence regarding a verbal argument between a corrections officer and a sergeant, the incidents do not involve comparable conduct. In his brief, Hopkins tries to characterize the relevant comparison as a non-protected corrections officer who has a verbal confrontation with another employee but is not disciplined. But again, Hopkins was not disciplined for raising his voice or having a verbal confrontation with another officer; he was disciplined for insubordination. Hopkins has not identified any non-protected corrections officer who failed to comply with a direct order from a superior, yet was not disciplined for such insubordination.

Accordingly, the Court concludes that Hopkins has not established a prima facie case of discrimination.[2] As such, the Court need not proceed to analyze whether Hopkins can show that

---

[2]In his brief, Hopkins also tries to rely on statistical evidence of black officers being disciplined more frequently than white officers to establish his prima facie case. As explained previously, however, Hopkins cannot use that evidence in connection with this motion. Moreover, Defendants direct the Court to *Bowdish v. Continental Accessories, Inc.*, 966 F.2d 1451 (6th Cir. 1992), 1992 WL 133022, for the proposition that such statistics alone, are not

Defendants' asserted legitimate, non-discriminatory reason is pretextual.

## II. Challenges To Count II, Hopkins's Title VII Retaliation Claims

In responding to the motion, Hopkins has narrowed the retaliation claims he seeks to pursue. (*See* Pl.'s Br. at 15) ("For purposes of Plaintiff's retaliation claim, Plaintiff will only utilize events that occurred after Plaintiff filed his EEOC charge of discrimination on January 11, 2017."). Hopkins now seeks to base his retaliation claim upon just two incidents: 1) the "tools and equipment" incident; and 2) the "restricted room incident." (*See* Pl.'s Br. at 16-17).

As to each of these incidents, based on the challenges in Defendants' motion, the Court must consider: 1) whether Hopkins exhausted his administrative remedies as to it; 2) if so, whether Hopkins can establish a prima facie case of retaliation based on that incident; and 3) whether Hopkins can establish pretext.

### A. Exhaustion

Defendants assert that Hopkins cannot proceed with a retaliation claim based on those two events because he failed to exhaust administrative remedies.

"It is well settled that federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can be reasonably expected to grow out of the EEOC charge." *Strouss v. Michigan Dep't of Corrections*, 250 F.3d 336, 342 (6th Cir. 2001). "Generally, retaliation claims based on conduct that occurs *after* the filing of the EEOC charge can be reasonably expected to grow out of the

---

sufficient to support a plaintiff's claim of individual discrimination. *Id.* at *5 ("Such evidence, standing alone, still would not be sufficient to establish a case of individual disparate treatment. An individual plaintiff in an employment discrimination case must present some evidence that demonstrates that his or her *individual* [adverse employment action] was the result of discrimination." (emphasis in original).

charge. *Id*. (citing *Duggins v. Steak 'N Shake, Inc*., 195 F.3d 828, 832-33 (6th Cir. 1999)) (emphasis added). "Because retaliation claims, by definition, arise after the filing of the EEOC charge, this rule promotes efficiency by requiring only one filing." *Ang v. Proctor & Gamble Co.*, 932 F.2d 540, 545 (6th Cir. 1991). "However, retaliation claims based on conduct that occurred *before* the filing of the EEOC must be included in the charge." *Id.* (citing *Ang,* 932 F.2d at 545. (emphasis in original).

Here, Hopkins filed his EEOC charge on January 11, 2017, and received his "right to sue" letter from the EEOC on April 12, 2017. Neither the "tools and equipment" incident (which occurred on April 9, 2017) or the "restricted room" incident (which occurred on April 27, 2017) occurred prior to the filing of Hopkins's EEOC charge. As such, he did not need to file another EEOC charge in order to proceed with a retaliation claim based on either of those incidents.

**B.      Prima Facie Case**

The parties agree that a prima facie case of retaliation under Title VII requires a plaintiff to show: 1) that he engaged in protected conduct; 2) his exercise of protected conduct was known by the defendant; 3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and 4) a causal connection existed between the protected activity and the materially adverse action.

The protected conduct here was Hopkins's filing of his EEOC charge (Pl.'s Br. at 16), so the first element is met. Being suspended without pay is clearly an adverse action for purposes of a retaliation claim.

Moreover, the adverse action required for a retaliation claim is "less burdensome than what a plaintiff must demonstrate for a Title VII discrimination claim." *Rogers v. Henry Ford*

*Health Sys.*, 897 F.3d 763, 776 (6th Cir. 2018). All the plaintiff must show is an action "that a reasonable employee" would have found the challenged action materially adverse, "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). A reasonable factfinder could conclude that being referred for two disciplinary investigations, both with the potential of a suspension without pay and the loss of the ability to transfer to another prison, would dissuade a reasonable worker from making a charge of discrimination. Therefore, the third element is met too.

What is in dispute is whether Hopkins can establish the second and fourth elements.

### 1. Second Element (Knowledge Of Protected Activity)

As to the second element, Defendants' opening brief claims that Hopkins cannot establish the requisite knowledge on the party of Defendant. (*See* Defs.' Br. at 15, asserting, regarding restricted room incident, that "there is no indication that the officer who wrote the incident report or issued the discipline knew anything about any complaint Plaintiff had made;" *see also* Defs.' Br. at 16, asserting, regarding tools and equipment incident, that "there is no evidence that the person who reported the incident or the person who issued the discipline had any knowledge of Hopkins's alleged protected activity."). Thus, Defendants appear to making the point that the person who reported the incident or Jennifer Nanasy, the officer who ultimately issues the discipline, had no knowledge of Hopkins's protected conduct. Their opening brief, however, does not discuss the Warden's knowledge.

Hopkins took it as undisputed that the MDOC and the warden were aware of the EEOC complaint. (*See* Pl.'s. Br. at 16) (stating "it is undisputed that [Plaintiff] has satisfied the first

two elements of this claim.").

Then, in their Reply Brief, Defendants assert that "[t]here is no evidence that Warden Campbell knew anything about Hopkins's complaints." (*Id.*).  Defendants made the argument regarding Warden Campbell's knowledge for the first time in their reply brief.

Notably, Warden Campbell was involved in the disciplinary proceedings as to both of the alleged retaliatory discipline incidents (ie., the restricted room and tools and equipment incidents).  He held the disciplinary conferences for these incidents and he found that Hopkins had violated the work rules at issue.

Hopkins's January 11, 2017 EEOC charge alleged race and sex discrimination.  When that charge was filed, Warden Campbell was the acting warden of the prison.  (*See* Ricumstrict Dep. at 14, stating that Campbell replaced Klee in approximately February of 2016).   As such, it is only fair to assume, for purposes of this motion, that Warden Campbell would have been aware of that EEOC charge as the acting warden.

### 2.     Fourth Element (Causal Connection)

In his brief, Hopkins asserts that the temporal proximity between his protected conduct and the two adverse actions established the fourth element of a causal connection, asserting:

> As for the April 9 incident, the first instance of retaliation, then-Warden Campbell decided to investigate Plaintiff for a work-rule violation at the latest on April 14, 2017.  (Pltf's SOF ¶ 99).  Almost exactly three months after Plaintiff filed his charge of discrimination.  This is the relevant date for purposes of the causal connection as initiating the investigation shows the retaliatory animus.  For the second work-rue violation (the April 27 incident), the Warden decided to investigate Plaintiff on April 28, 2017.  (Pltf's SOF ¶ 107).  Again, approximately three months after Defendant MDOC received notice of Plaintiff's charge.  Following the Sixth Circuit's temporal proximity-plus standard elicited in Dixon, two separate allegations of discipline in a matter of three weeks, all within a three-month period from the filing of his EEOC charge sufficiently establishes causation.

(Pl.'s Br. at 18).  Hopkins further asserts that the temporal proximity here alone is sufficient to establish a prima facie case. (Pl.'s Br. at 19).

Hopkins also asserts that evidence of differing treatment between him and corrections officers who did not engage in protected conduct helps establish a causal connection.  (Pl.'s Br. at 19).  But to support that position, Hopkins directs the Court to his vague deposition testimony about unidentified corrections officers leaving unspecified "stuff open," on unidentified dates, and not being disciplined by unidentified supervisors:

> See, now I'm observant, I sit and watch, I watch *these guys* walk away and *leave stuff open*, and I laugh to myself, these guys gave me all this time off and look all this money, suspended me these days, taking money from me and my family, and I sit and watch these things. I would watch supervisors come in and they don't say one word.

(Hopkins Dep. at 66-67).  Hopkins has not identified such corrections officers, does not identify the "stuff" they "left open," and does not indicate whether or not those persons had filed any EEOC complaints.  As such, that argument does not aid Hopkins and the Court is left with the temporal proximity standing alone.

The case law in the Sixth Circuit has been inconsistent over the years about whether temporal proximity, standing alone, can be sufficient to establish a causal connection.  Recent case law reflects that it can.  *See, e.g., Rogers, supra*.  In that case, the Sixth Circuit found that the temporal proximity alone established the causal connection element:

> In this case, Rogers filed her first EEOC charge on July 3, 2013.  R. 48-21 (July 2013 EEOC Charge) (Page ID #902).  Adams met with Rogers and referred her to a fitness-for-duty exam on September 11, 2013.  R. 55-5 (Adams Dep. 65-68, 71) (Page ID #1279-78).  This is sufficient temporal proximity to establish a causal connection.  *See Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d 274, 283-84 (6th Cir. 2012) (collecting cases holding that a two-to-three month time lapse between a plaintiff's protected activity and occurrence of a materially adverse action is sufficient temporal proximity to satisfy a plaintiff's prima facie case of

retaliation).

*Rogers,* 897 F.3d at 777.

As such, the Court finds, for purposes of this motion, that Hopkins has met the fourth element by virtue of temporal proximity.

### C. Pretext

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, non-retaliatory reason for the challenged adverse action. If the defendant meets that burden, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for retaliation.

Here, Defendants assert that Hopkins was investigated and disciplined for these two incidents because Hopkins violated the work rules.

A plaintiff can refute the legitimate, nondiscriminatory reason that a defendant offers to justify an adverse action by showing that the proffered reason: 1) had no basis in fact; 2) did not actually motivate the defendant's challenged conduct; or 3) was insufficient to warrant the challenged conduct. *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003). The first type of showing consists of evidence that the proffered bases for the termination never happened (*i.e.,* that they are factually false). With respect to the second kind of showing, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The third showing consists of evidence that other employees, particularly those not in the protected class, were not fired even though they engaged in similar conduct. *Id.*

As the Sixth Circuit has explained, "[p]retext is a commonsense inquiry: did the employer make the decision at issue for the stated reason or not?  This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is."  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

### 1.    "Tools And Equipment" Incident

As to the April 9th tools and equipment incident, Hopkins contends he can show prextext via two different avenues.  (Pl.'s Br. at 19).

As his second way of establishing pretext, Hopkins asserts that similarly-situated corrections officers engaged in similar conduct, but were not disciplined.  As explained previously, however, Hopkins testimony about unidentified persons "leaving stuff open" is not sufficient evidence to show that similarly-situated, non-protected employees were treated more favorably for comparable conduct.  That leaves Hopkins's other attempt at establishing pretext.

Hopkins argues that his alleged failure to secure items and/or the doors is "insufficient to explain" the MDOC's decision to severely discipline him for that conduct.  In support of that argument, he directs the Court to evidence showing that another corrections officer, and some nurses employed at the prison, testified that the conduct Hopkins was charged with was actually a common occurrence at the prison.

The Warden's decision to investigate Warden for this incident occurred within three months of Hopkins's filing of his EEOC complaint.

During the disciplinary conference for this incident another corrections officer and Plaintiff's union representative, Paul Reasoner, stated it was "common practice for the doors to be unsecured" and requested the "charges related to the locking of the doors be dismissed."  (*Id*.

at ¶ 101).  Reasoner also requested leniency at the conference regarding the "equipment"

allegations because the items "were left in a secure area . . . this was a case of human error" and

Hopkins is "a good officer who made a mistake."  (*Id*. at ¶ 102).  During the investigation, some

of the nurses involved said it was "regular occurrence" and/or "common practice" that the doors

in question "always remained open" and that a "radio unit . . . is always left out for the on-

coming nurse."  (*Id*. at ¶ 103).  Hopkins also explained in his investigatory response that it "is

quite common for officers to remove their duty belts and/or equipment before being relieved."

(*Id*. at ¶ 104).

Warden Campbell found that Hopkins violated the work rules and Hopkins ultimately

received either a three or four-day suspension for this incident.

This evidence could convince a jury that while Hopkins technically violated the work

rule at issue,  the work rule was being selectively enforced against Hopkins, even though

violations of the work rule were a common occurrence.  The Court concludes that, viewing the

evidence in the light most favorable to Hopkins,  a reasonable jury could conclude that the

defendant's legitimate, nondiscriminatory reason for disciplining Hopkins for this incident is a

pretext for retaliation.


### 2.    "Restricted Room" Incident

Hopkins also asserts that he can offer sufficient evidence of pretext as to the restricted

room incident.

Again, the Warden's decision to investigate Warden for this incident occurred

approximately three months of Hopkins's filing of his EEOC complaint.

Hopkins notes that while some mitigating evidence was presented at the disciplinary hearing, such as that the doors normally close automatically and a work order had been submitted for the door, he was still found to have violated the work rules.

Moreover, although the memorandum noted that the conduct in question "was a possible violation" of the work rules cited, Hopkins was not only found to have violated the work rules, he was given a seven-day suspension due to "aggravating circumstances." Yet no aggravating circumstances were explained or set forth in the section of the Disciplinary Report titled "Explain Aggravating or Mitigating Circumstances."

Hopkins also directs the Court to Ricumstrict's testimony that determining whether there are aggravating circumstances is a decision normally made at the Warden's level. (Ricumstrict Dep. at 38). Hopkins claims that the "Warden's decision to exacerbate Plaintiff's discipline without reason just months after Plaintiff filed his EEOC charge against GHCF creates an inference that a retaliatory animus impugned his judgment." (Pl.'s Br. at 21).

The Court concludes that Hopkins has presented sufficient circumstantial evidence of pretext as to this second incident to survive summary judgment.

**III.     Challenges To Count III, § 1983 Equal-Protection Claims Against The Individual Defendants.**

Count III is Hopkins's Equal Protection Claim, brought under § 1983 against the eight individual Defendants (Klee, Fleenor, Salisbury, Christiaens, Woodard, Every, Ricumstrict, and Duperron), who were all sued in their individual capacity.

Defendants' Motion for Summary challenges this count, noting that the analysis of this

claim is nearly identical to the analysis of Hopkins's Title VII discrimination claims and asserting that the count should be dismissed for the same reasons.  (Defs.' Br. at 8-9).

In responding to this challenge, Hopkins contends that the "has a valid equal protection claim *against Warden Klee*."  (Pl.'s Br. at 22) (emphasis added).  Hopkins's Statement indicates that he "has agreed to dismiss" Defendants Fleenor and Salisbury from this case.  (Pl.'s Stmt. at ¶¶ 76 & 77).

At the November 15, 2018 hearing, Plaintiff's Counsel confirmed that Hopkins now only wishes to pursue Count III against Defendant Klee.  As such, the Count shall consider this claim only as to Warden Klee and shall dismiss this count with prejudice as to the other Defendants.

Warden Klee is entitled to summary judgment as to Count III, Hopkins's § 1983 equal protection claim against him.

To establish an equal protection claim against a public employee under § 1983, the plaintiff must show that the employer made an adverse employment decision "with discriminatory intent and purpose.*"  Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000).  "Because both Title VII and § 1983 prohibit discriminatory employment practices by public employers," the Sixth Circuit "looks to Title VII disparate treatment cases for assistance in analyzing race discrimination in the public employment context under § 1983." *Id.*  As such, the plaintiff can survive summary judgment with either direct evidence or under the circumstantial-evidence approach.

Hopkins's brief states this Equal Protection claim against Warden Klee only "encompasses the discipline and/or unpaid suspension [he] received regarding the Duperron incident."  (Pl.'s Br. at 24).  Hopkins does not direct the Court to any direct evidence that could

support this claim. Rather, he attempts to rely on circumstantial evidence. Hopkins attempts to support this claim by: 1) relying on his disparate treatment analysis as to the Duperron incident; and 2) directing the Court to Hopkins's statistical expert's report.

As explained previously, Hopkins cannot show that any similarly-situated non-protected employee was treated more favorably than he was as it relates to his discipline for insubordination. In addition, because Hopkins failed to timely produce his expert statistical report, he cannot rely on it for purposes of the pending motion for summary judgment. Accordingly, the Court concludes that Hopkins cannot survive summary judgment as to his equal protection claim against former Warden Klee.

## CONCLUSION & ORDER

As explained above, because Hopkins failed to timely produce his expert statistical report, the Court **ORDERS** that this Court will not consider that statistical expert report for purposes of this motion. In addition, Plaintiff may not use that report at trial or offer testimony from that statistical expert at trial.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED in PART**. The motion is **DENIED** as to the Title VII retaliation claim, because Hopkins has submitted sufficient evidence to establish a prima facie case, and pretext, as to the two disciplinary incidents at issue for this claim. The motion is **GRANTED** in all other respects, and all remaining counts are **DISMISSED WITH**

**PREJUDICE**.

       **IT IS SO ORDERED**.

                          s/Sean F. Cox_____
                          Sean F. Cox
                          United States District Judge

Dated:  November 19, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 19, 2018, by electronic and/or ordinary mail.

                          s/Jennifer McCoy_____
                          Case Manager